The first case today is No. 141641, United States v. Daniel E. Carpenter. Ms. Holman. Good morning. Kimberly Holman for Appellant Daniel Carpenter. I'd like to reserve two units for rebuttal. Yes, you may have that. Thank you. This appeal arises from a forfeiture order entered by the district court two months after Mr. Carpenter filed his notice of appeal from his conviction and sentence. I'd like to focus my argument on two main points. One, whether the district court lacked jurisdiction to enter the forfeiture order since the notice of appeal had already been filed. And then you filed a later one, and the court in response to the first order, this court, said it was not going to reach the issue of the amount of the forfeiture. Are you sure you want to spend your time arguing that? It's your choice. I don't believe, Your Honor, that that changes the equation. The question is whether the district court had jurisdiction. We have a case that says jurisdiction is actually the wrong term to use. It's a matter of divestiture and which court, the court of appeals or the district court, is better suited to rule on that. That's true, but that's the... Why would we have been in a better position to rule on the amount of the forfeiture when the amount of the forfeiture had not, in fact, been determined at the time you took the first notice of appeal? Because had the matter proceeded as it should have, Judge O'Toole would have reached his forfeiture decision, asked the court to remand the matter to him, and then... And then what? Entered the same order he entered eventually? No. And how are you better off with that scenario being followed? This is not a case like Rodrigo's Rosado in which the court thought it was a foregone conclusion that the district court, having denied the defendant's motion for sentence modification three times already, would certainly do so again. There are... This is a case in which the judge had considerable reservations at sentencing about whether any forfeiture was appropriate. He... Well, did he make it clear at sentencing that he was reserving that question for later, that he said there will be a forfeiture order later on? He did say that, and the parties did consent to that, but it was up to the court, as this court said in United States v. George, to ask this court to return jurisdiction, or to return, if you want to use the word, the authority to him to act on that. Okay, could you address my question? How does that possibly help your client? Other than delaying everything, what makes you think the district court would have, if we, if there had been an application to us to remand to him, that the district court would have entered a different order? The district court might not have entered a different order at that time, but then everything, the court's entire, Mr. Carpenter's entire sentence, could have been taken up by this court at that, as part of his, as part of his appeal. That is the procedure that the court in United States v. George... ...is the amount of the forfeiture. That's correct. That's correct. But... Okay, what was your other argument? The other argument is whether Mr. Carpenter acquired those 14 plus million dollars within the meaning of 18 U.S.C. section 981A2B. But you don't deny that he had, he took use of all of that money. Isn't that enough for acquired? He actually had the money, he had the ability to use it as he did improperly, as that's not an issue here. He, so he had it. So isn't that enough for acquired? I think it would have been enough for obtained, but the Congress used a different word in acquired and in section 2B, which focuses on profits, not the gross amount that the defendant takes in. And I think you have to look at the structure of the section 1031 service. Those funds never became Carpenter's. They were held in escrow by... But he had access to them. He had access... Complete access to them and the ability to use them as he did. So how do you get around that issue? Because the contracts with these exchangers required that the funds be invested. These exchangers all chose a 6% rate of return. And the contract... Given the fact that he offered two choices, three or six, obviously everybody was going to take six and they did. And the exchangers who testified all agreed that they knew that their money would have to be invested some way. And in fact, the contracts with the exchangers said the money will be invested so that the... to his representation to the investor exchangers? He did not take it. Okay, are you making a different argument than the argument you made in your brief? In your brief you say acquire must mean ownership. Is this a different argument? It means ownership or the ability to exert control over profits. Now there would... You're arguing that unless the government showed that he made money, but he did make money, profit if you use your argument, until the economy turned around, the scheme was working. But it was still a scheme and it was different from what he told his investors that their money would be safe, that when time came to do the transfers, it would be there. And in fact, he took complete control of these funds and invested them in a way that once the market turned, it didn't work any longer. The government chose to select as the forfeiture amount the funds entrusted by the last seven exchangers. There were profits earlier, but the government, in other words, say... He was found guilty of running an improper scheme. That's true, but under Section 2B, you focus on the profits from the illegal transactions. The money entrusted by the exchangers to the corporation to hold in escrow could never become profits. Profits would be if the funds were invested and made 10%, say, 6% was given to the exchanger, then that 4% is profit. But that money, Mr. Carpenter did not have... I'm sorry, suppose it was just 6% and he takes his share out of that, isn't that a profit? He's charging some fee for a return of investment, regardless of whether it's 6% or 10%. Why isn't that profit? The fee would be profit. Anything that the company made over and above the amount of return it had promised the exchanger was profit, but that was not the approach the government used. The government claimed that every penny the last seven investors... And this was a legitimate service that was being provided. There were 126 total exchangers who entrusted their money to the corporation. 119 of those were successful. So this falls squarely into the profits rationale of Section 2B. The district court found that the defense of deduction of direct costs had been waived by not being argued to it. Are you now in that area? No, I don't believe so. I'm not in that area, Your Honor, because those funds could never be profit. It's not a question of subtracting anything from them. The question of deducting the funds returned to the exchangers only arises if you assume the entirety of the $14 million. Counsel, I wonder if you could spend a few minutes on your excessive fines argument. You seem to be making the argument that there would be something disproportionate, excessive in the forfeiture amount sought by the government because it's disproportionate to the harm that was caused to the defendants. Could you elaborate on that a bit? Are you suggesting that because through civil litigation, some modest contribution from your client, that the victims have largely been made whole? Is that why you're suggesting that in light of that outcome, it would be disproportionate to impose this forfeiture? That's part of the argument, Your Honor, but only one part of the argument. Okay, outline for us what the argument is on excessive fines. You admit you have to refer to the congressionally authorized maximum fines, correct? This court has said that the congressionally authorized fines and even more so the fines authorized by the guidelines are the most important of the Helderman factors. When did we say even more so? I don't have the case at my fingertips, but it is cited in the brief. Okay, so let's start with the statute. The statute sets a maximum fine of $250,000 per count. Which gets us to what? Gets you to approximately $4 million, but the guidelines which, and I will supply the court with the name of the case on rebuttal, set the maximum fine of $100,000. Isn't there another statutory provision applicable in this case that suggests the fine could be twice the amount of the money that was lost? I would contend, Your Honor, that that provision cannot be applied in this case under the authority of Southern Union because the jury's verdict did not find a loss. The government did not seek a jury verdict on the loss amount. Okay, you preserved your Southern Union argument. We've already said the Supreme Court reached a contrary conclusion some years ago, and we can't overrule the Supreme Court. Maybe they can. Well, that's true, Your Honor, but the Southern Union, I think, comes into play here because it would mean that the court could not... Was that argument presented to the district court? I don't believe it was. I don't believe it was, but it was argued that those provisions should not be applied. Okay, you have your two-minute rebuttal. Okay, thank you, Your Honor. Good morning. Kirby Heller for the United States. Let me turn to the merits of the forfeiture order, unless the court has some questions about it. Yeah, why don't you start with the excessive fines argument because it has some intuitive appeal. He didn't actually profit by $14 million, but the government now has a forfeiture order against him for $14 million, which most likely he's never, ever going to be able to pay off, and it's not dischargeable in bankruptcy. Certainly, Your Honor. So there are three factors that courts have considered in determining the excessive fine. The first is does the defendant fall within the category of defendants who are penalized by the offense of conviction, and as we argue in our brief, Carpenter certainly does. His crime was making misrepresentation. Can you move on, please? I don't think that's disputed. Okay, so I guess the second factor then is what the court is interested in, which is the number as compared to the statutory maximum and the guidelines, and again, as was mentioned during the appellant's argument, there is an enhanced statutory penalty, maximum penalty that could apply in this case, which would be double the loss, which is $18 million. So this forfeiture is less than that. Counsel, the factors that Judge Lynch noted that suggest that there's something that seems a bit unfair about this, that in fact he never realized any problem. This is not like a drug transaction where somebody has made a lot of money from the illegal transactions and the government seeks forfeiture of those ill-gotten profits. This is not that kind of case. He did these transactions, towards the end failed, he did not realize any profit from it, and yet the government is now asking that he forfeit $14 million that he never actually realized, but it appears, and maybe this is your point, that any of the factors relevant to the excessive fines analysis don't really go to the issue that Judge Lynch mentioned, that I will acknowledge somewhat concerned me. Is that your argument, that's just irrelevant? The fact that you're now seeking forfeiture of money that you never realized, that just doesn't matter? Is that your position? Well, our position is that these became proceeds at the moment he obtained control through his misrepresentation. The fact that he didn't find it... Pardon me, but that goes to the statutory definition. It does not go to the argument that Judge Lopez has just presented to you, and I think you better respond to that. Certainly. The reason I made that statement, and I'll go back to the comment, is that it doesn't have to be profits, you have to look at how proceeds are defined, and if proceeds are defined according to the statute, then that is the amount that the court should look at in determining whether it is an excessive fine. The fact that he ultimately lost that money doesn't make a difference in terms of the excessive fines, because his proceeds were $14 million. So the fact that it's, in some real world sense, that it's ruinous, I mean, he'll never be able to earn a livelihood, and never have paid off, none of that matters for purpose of this Eighth Amendment analysis. That seems to be your argument. Well, certainly the livelihood issue would not be an argument, because this court has stated that that's a factor to take into account, and Mr. Carpenter did raise that in the district court, and the district court found that he hadn't made a sufficient showing of that, but he hasn't raised that on appeal. So that certainly would be a factor that could temper this, and perhaps a more appropriate factor. But if one just takes the comparison of when this money became proceeds, and is that an excessive fine, because it became proceeds, as soon as he acquired these funds as a result of the representation, then those are direct proceeds of his fine, aren't they? There is Supreme Court case law that says the purpose of forfeiture goes well beyond restitution, it goes well beyond depriving someone of profits that they've made. It is really meant to deter other people, because the possible penalty of forfeiture can be so much greater than you could hope to accomplish from your crime. And because of that, results like this are not unconstitutional. But you don't seem to be making that argument. We certainly made that argument in our brief, and we renew it here, in that even if he didn't profit and run off with the money, it certainly is part of the punishment, which is what forfeiture is. Is it the policy of the U.S. Attorney's Office or the Justice Department to seek the maximum forfeiture amount that is available? I'm not sure I can answer that. Well, why did you seek the sum in this case? Well, I think the government sought that sum because that was how proceeds are defined. So I guess the answer in this case is yes, that that's how we define proceeds. We're not going to pick an arbitrary number. That is the amount that he acquired as a result of his fraud. Doesn't this size forfeiture make it almost impossible for the defendant to rehabilitate himself in an economic way so that with lesser fines, lesser forfeiture, there's a likelihood he, after all, he was apparently a successful person until he developed this scheme, that he could, if given some leeway, could possibly rehabilitate himself and pay a more reasonable amount to the government than this amount, which makes it pretty clear that he can't ever pay anything so that it's sort of a zero-sum game for you. You get a big number, but it doesn't mean anything, does it? Well, that might be the case, Your Honor, and that might be the case in many of these money judgment cases. But the fact is we have a statutory definition of proceeds and the $14 million falls within that statutory definition. Again, he could have argued before this court, and he could have argued perhaps with more detail in front of the district court, the livelihood issue, and perhaps that would have had some traction, but we don't have that argument here. Does the district court have any discretion whatsoever as if it finds the proceeds amount is $14 million, does it have any discretion to make the forfeiture order for less than the $14 million? Well, perhaps under the excessive fines analysis, but not under the statute, I don't believe. I don't understand the answer. I'm sorry. You've already told us there's no excessive fines. Well, yes, I thought that Your Honor was guessing it in general, but in this case, no, I think. In this case, if that's how proceeds are defined, then that would have to be in the judgment. Okay, let's go back to her statutory argument that the term acquire is different than the term obtain, and the Congress had to mean something by that difference. Yes. So that's a general rule. In this case, to try to understand what the term acquired means, we look at dictionary definitions, and it turns out that dictionary definitions define obtain to mean acquire and define acquire to mean obtain. I think Honeycutt is a very good example of how those terms are interchangeable. The statute at issue in Honeycutt was a different one. It was 853A1, which has the obtain language, and it's similar to 981A2A, but in discussing what it meant in describing and analyzing why there's no joint and several liability, it used the terms interchangeably throughout the opinion, not just once. It kept talking about the amount of money. Even though it's an obtain definition, the amount was acquired, again showing that these are different. Do we actually have to hold that acquire means the same thing as obtain in order to affirm in this case? I thought the only argument really being made was the ownership argument, and if you say no, the term acquire does not mean you have to own. Doesn't that end the case? It doesn't have to mean no, and that's correct. So why is the government pushing for a broader ruling that acquire and obtain mean exactly the same thing in two successive provisions of a statute that Congress enacted using different terms? I guess I'm just trying to go through some analyses for how we determine what a word means, but certainly it is the government's position that acquire doesn't have to mean ownership. The Contarini case, which is a Second Circuit case that the district court relied on, talks about control, and in this case, Mr. Carpenter had control of these funds. Once he made his misrepresentations and got a hold of this pot of money, he had the control to decide what to do with it, whether he invested it in these options trading, whether he used it to return to some investors in the same, as if it were a Ponzi scheme. He had control of these funds, and that's sufficient to satisfy the definition of acquire in that provision. If there are no other questions, we'll rest on our brief. Thank you. If you're caught by surprise by something she says, we'll give you a minute. Okay, thank you. The first, excuse me, to supply this site was United States v. Barras, 183 F. 322, in which this court said that the maximum fine under the guidelines is even more an important factor. Thank you. As terms of the excessive fines clause argument, the government's argument is predicated on the notion that it is subsection 2A that applies here, rather than subsection 2B. They make that argument, but then they go on to say it doesn't really matter. They win under either section. It matters in the sense of, if you look at the Contarini's case, on which the district court also relied, they specifically focused in on control over the profits. Now, if there were unrealized profits sitting in the corporation, and Mr. Carpenter had not yet taken ownership of them, but had control over those profits, that under normal definitions could be, under the Contarini standard, would be acquired. But never did he acquire the exchanger's funds, which were at all times held in escrow. Controlling how they were invested is not control over the profits, and I think Contarini makes that clear. In terms of the government decided United States v. Honeycutt, that was a case in which the court was considering whether there could be joint and several liability for forfeiture. The court had no reason to distinguish between obtain and acquire. That's true, but it's a Supreme Court case, and for the term acquire it looks to common dictionary definitions. It does, but then again you have to go back to the point that these were two provisions enacted at the same time by a Congress... Okay, we've got it, we've got it, thank you. Does the government need a minute? No, Your Honor. Okay, thank you both.